**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHRISTINE W.,**

**Plaintiff,**

**v.**

Civil Action 2:20-cv-6067
Judge Edmund A. Sargus, Jr.
Magistrate Judge Jolson

**COMMISSIONER OF
SOCIAL SECURITY,**

**Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Christine W., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

I. **BACKGROUND**

Plaintiff filed her applications for DIB and SSI on May 15, 2018, alleging that she was disabled beginning April 21, 2018.  (Tr. 231–41).  After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a video hearing on November 21, 2019, before issuing a decision denying Plaintiff's applications on December 18, 2019.  (Tr. 34–65, 12–33).  The Appeals Council denied Plaintiff's request for review, making the ALJ's decision final for purposes of judicial review.  (Tr. 1–6).

Plaintiff filed this action on November 25, 2020 (Doc. 1), and the Commissioner filed the administrative record on June 14, 2021 (Doc. 12).  Shortly thereafter, Plaintiff filed her revised

Statement of Errors (Doc. 15), and the Commissioner filed his Opposition (Doc. 16). Because Plaintiff did not file a reply, the matter is now ripe for consideration.

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's testimony as follows:

At the hearing, the [Plaintiff] testified to back problems resulting in pain, burning, and her legs giving out. She said she underwent a series of three injections, but they did not work. She rated her pain at a level 8-9 out of 10. She said she has been approved for medical marijuana, but it is expensive. She said she is able to lift a pot of coffee. She said she takes over-the-counter medications that only help a little. She said she has problems reaching overhead with the right arm. She said her left ankle was broken twice and she had surgery. She said she shattered her right ankle and has seven rods and pins in it. She said her boyfriend has to pull her up out of bed at times. She said her doctor gave her crutches at her last visit, and that she has a cane at home.

She said she tries not to use the cane and just holds onto furniture. She stated that she falls frequently. The [Plaintiff] stated she is able to sit for about 45 minutes, stand about 15-20 minutes, and is unable to walk very far. She said she tries to do the dishes and some laundry. She said she uses inhalers for her breathing issues. She said her primary physician just moved out of state so she is trying to find a new doctor. The [Plaintiff] testified to no side effects from her medications.

(Tr. 22–23).

### B. Relevant Medical History

The ALJ summarized Plaintiff's medical records related to her leg edema:

As to leg edema, on June 10, 2019, the [Plaintiff] was seen in the emergency room for complaints of ankle/feet swelling. However, she denied any recent changes in medications, denied chest pain, and denied any shortness of breath. She reported worsening symptoms when walking for extended periods of time (Exhibit 7F, p. 26). Cardiac testing revealed the [Plaintiff]'s EKG was within normal limits and her chest x-ray revealed no acute process (Exhibit 7F, p. 31). She was advised to elevate her legs 3 times daily to help the swelling resolve, was started on a fluid pill, and advised to wear compression stockings (Exhibit 7F, p. 31). Follow-up at her primary care physician's office on June 19, 2019, indicated her bilateral edema had improved (Exhibit 12F, p. 74). In August 2019, she was seen in the emergency room for swelling and redness of her lower extremities. Examination revealed non-pitting edema of bilateral feet, ankles, and lower legs. However, motor, sensation, and pulses were intact. Further, an ultrasound of the right leg revealed no evidence of deep venous thrombosis (DVT) (Exhibit 8F). Subsequent cardiac testing revealed no chest discomfort and no ischemia changes (Exhibits 12F, pp. 24, 30).

2

The [Plaintiff]'s ejection fraction was 55 percent, which was in the normal range (Exhibit 12F, p. 33). A pain management note dated August 15, 2019, indicated the [Plaintiff] had no swelling or redness of any joints (Exhibit 9F, p. 46). A primary care note dated October 2019 indicated the [Plaintiff] had only occasional bilateral leg edema. Physical examination revealed no clubbing or cyanosis (Exhibit 12F, pp. 98, 100). The undersigned notes that although the [Plaintiff] was advised initially to elevate her legs 3 times daily to resolve the swelling, subsequent notes indicate improvement in her swelling and contain no recommendations for continued elevation of her legs. Further, the record reveals no associated cardiac diagnosis to account for her leg edema. Notably, the record does not indicate the presence of leg edema lasting for 12 continuous months. Accordingly, the undersigned finds the [Plaintiff]'s leg edema is considered non-severe. The undersigned notes that even if the [Plaintiff] had to elevate her legs three times per day, the vocational expert testified that if she had to elevate her leg more than two times during an eight-hour workday she could still perform her past work as a shift manager/supervisor along with the other jobs identified below unless leg evaluation was required for the entire day, which is not shown by the evidence of record.

(Tr. 18).

The ALJ summarized Plaintiff's medical records related to her mental impairments:

As to alleged mental impairments, the record reveals the [Plaintiff] was started on Amitriptyline in October 2018 for anxious mood (Exhibit 4F, p. 31).

On November 5, 2018, Ryan Wagner, Psy.D., performed a consultative psychological evaluation of the [Plaintiff] and diagnosed major depressive disorder, recurrent, moderate and generalized anxiety disorder. The [Plaintiff] appeared anxious and depressed during examination. Dr. Wagner opined the [Plaintiff]'s described potential impacts of mental health problems on work performance may lead to emotional instability when presented with critical supervisory feedback and difficulty developing and maintaining appropriate co-worker relationship and opined that the [Plaintiff]'s described anxious symptoms may compromise her ability to respond to work pressures and lead to increased likelihood of agitation and experiences of anxiety attacks (Exhibit 4F). The undersigned finds this opinion is not persuasive, as it appears based mainly on the [Plaintiff]'s reported symptoms during a one-time evaluation. Further, the opinion is vague, as it did not give specific work-related limitations.

In July 2019, the [Plaintiff] was seen in follow-up for her anxiety and depression. She reported Zoloft had helped and requested a refill. The impression was anxiety associated with depression. Mental status examination was grossly normal (Exhibit 12F, pp. 79-80).

The undersigned notes that the [Plaintiff] has been prescribed medication by her primary care physician and has not required treatment by a mental health professional. Further, she has not required emergency room treatment or

3

> hospitalization for a mental impairment. Overall, the record reveals the [Plaintiff]'s conditions are generally controlled with medication. Accordingly, the undersigned finds that the [Plaintiff]'s medically determinable mental impairments of major depressive disorder and generalized anxiety disorder, considered singly and in combination, do not cause more than minimal limitation in the [Plaintiff]'s ability to perform basic mental work activities and are therefore non-severe.

(Tr. 18–19).

The ALJ summarized Plaintiff's medical records related to Plaintiff's physical impairments:

> As to degenerative disc disease (DDD), records dated prior to the alleged onset date, revealed the [Plaintiff] was seen at Selby General Hospital in January 2018 for complaints of left hip pain due to a fall. She indicated she had called off work on Saturday and needed an excuse for that day. X-ray findings revealed no acute traumatic pelvic or left hip pathology. However, imaging showed dextroconvex lumbar scoliosis with facet arthropathy of the lumbosacral junction. Physical examination revealed normal motor strength at 5/5 and intact sensation (Exhibit 1F).
>
> On June 11, 2018, the [Plaintiff] was treated in the emergency room for complaints of back pain and right hip pain. She reported falling several days prior and having persistent pain since that time. Physical examination revealed tenderness of the spine and a hematoma over the right hip. A computerized tomography (CT) scan revealed no fracture of dislocation of the pelvis or either hip (Exhibit 2F, p. 16). A CT scan of the cervical spine revealed mild multilevel degenerative changes and no evidence of fracture of subluxation of the spine (Exhibit 2F, p. 18). A CT of the lumbar spine revealed no acute fracture or dislocation, no disc protrusion or central spinal stenosis, and mild to moderate stenosis of the left L3-4 neural foramen secondary to decreased disc height and discovertebral complex (Exhibit 2F, p. 19). Notably, she was stable throughout her emergency room visit and had improvement in her symptoms with medication (Exhibit 2F, p. 9).
>
> A primary care note dated July 16, 2018, revealed that on examination the [Plaintiff] was comfortable and in no acute distress. She had limited range of motion and pain of the lumbar spine. Her condition was treated conservatively with NSAIDS and Flexeril (Exhibit 5F, p. 11). In September 2018, the [Plaintiff] was prescribed Baclofen for back pain (Exhibit 5F, p. 35).
>
> On September 13, 2018, H. L. Krupadev, M.D., performed a consultative medical examination of the [Plaintiff]. Physical examination revealed the [Plaintiff] was in no acute distress or discomfort. She was able to get on and off the examination table. She was able to walk on her toes, but unable to walk on her heels or squat. Musculoskeletal examination revealed no muscle weakness or atrophy. She had some tenderness and mildly decreased range of motion of the lumbar spine with

4

lumbar flexion of 70 degrees. However, her gait was satisfactory. Neurological examination revealed normal sensory and motor functions. The [Plaintiff]'s Romberg sign was negative (Exhibit 3F).

The record indicates the [Plaintiff] was referred to pain management for treatment of back pain and leg pain. During initial evaluation on September 25, 2018, the [Plaintiff] reported having to take multiple breaks and having trouble with her activities of daily living. Physical examination findings included 5/5 strength in bilateral lower extremities; slightly reduced reflexes; pain with sacroiliac (SI) compression, left worse than right; pain upon piriformis testing, left worse than right; negative straight leg raising (SLR) test; negative Patrick's test; tenderness to left lower back; mild tenderness in right SI joint area; intact sensation; no atrophy; and only mild edema in the bilateral lower extremities. She was slow from sit to stand and had a slight antalgic gait (Exhibit 6F, p. 5). The recommended treatment included trigger point injections for pain control and physical therapy (Exhibit 9F, p. 30).

Physical therapy records dated October 2018 indicated some initial improvement in the [Plaintiff]'s pain (Exhibit 9F, p. 7). However, the [Plaintiff] requested discharge after only two weeks of therapy and indicated it was not helping (Exhibit 9F, p. 10). Accordingly, she was discharged from physical therapy.

A magnetic resonance imaging (MRI) of the [Plaintiff]'s lumbar spine dated November 19, 2018, revealed mild to moderate DDD of the lumbar spine with mild to moderate stenosis (Exhibit 9F, p. 29). A pain management note dated January 31, 2019, indicated the [Plaintiff] had increased pain with physical therapy. The physician reviewed the [Plaintiff]'s MRI and recommended conservative treatment with epidural steroid injections (Exhibit 6F, p. 10).

On June 10, 2019, the [Plaintiff] was seen in the emergency room after she fell down 13 steps when one of the steps gave way. She had been seen earlier that day in the emergency room for peripheral edema. X-rays of the [Plaintiff]'s lumbar spine, cervical spine, and shoulder were negative for acute fractures or dislocation. The impression was myofascial pain that required only treatment with a short course of muscle relaxers and ibuprofen, 800 mg (Exhibit 7F, pp. 17-22). The [Plaintiff] returned to the emergency room five days later with complaints of lower back pain. Physical examination revealed some decreased range of motion and muscle spasms, but no tenderness and no leg pain with SLR testing. The impression was left lumbar strain. The [Plaintiff]'s muscle relaxer was changed to Skelaxin as she reported good relief in the past with this medication. The impression was acute exacerbation of low back pain (Exhibit 7F, p. 8). Pain management records dated August 2019 and October 2019 revealed continued treatment with injections of the back (Exhibits 9F, 10F, and 11F). Physical examination in August 2019 revealed decreased range of motion, 1+ bilateral lower extremity reflexes, pain, and tenderness, but a negative SLR test, normal strength, intact sensation, and no atrophy (Exhibit 9F, p. 51). A note dated October 23, 2019, indicated the [Plaintiff]

had previously had excellent relief with facet injections (Exhibit 11F, p .7). Treatment with lumbar medial branch blocks was recommended (Exhibit 11F).

With regard to the [Plaintiff]'s mild to moderate degenerative changes of the left ankle, a primary care note dated July 2018 indicated that on examination the [Plaintiff] had no pedal edema, full range of motion, and no calf tenderness. Examination of the foot revealed normal dorsalis pedis. The impressions were right ankle pain and history of ankle surgery (Exhibit 5F, p. 11).

During consultative examination, the [Plaintiff] had decreased range of motion of the hips, knees, and ankle joints. She had scars involving the back of the left knee and both ankles. Deep tendon reflexes could not be obtained in the ankles (Exhibit 3F).

On October 26, 2019, the [Plaintiff] presented to the emergency room with complaints of left foot pain for six or seven days after a frozen roast fell out of the freezer onto her foot. Physical examination revealed mild soft tissue edema primarily at the ankle but no ecchymosis or erythema, intact range of motion of the foot, intact ankle mortise, intact normal capillary refill, normal light touch, and normal temperature of the foot. X-rays revealed no evidence of a foot injury (Exhibit 13F, p. 14). She was advised to get a plantar fasciitis insert for her shoe, do exercise stretches, and was referred to podiatry (Exhibit 13F, p. 16). The record indicates that on October 31, 2019, she was treated again in the emergency room for complaints of left ankle pain. She reported that her symptoms initially improved but then reoccurred such that she was unable to bear weight. However, x-ray findings revealed no evidence of fracture (Exhibit 13F p. 2). A CT of the [Plaintiff]'s ankle revealed mild to moderate degenerative changes of the ankle mortise. The [Plaintiff]'s arthritis of the ankle and foot swelling were noted as stable (Exhibit 13F).

A note dated November 7, 2019, revealed the [Plaintiff] was seen in the podiatry clinic for complaints of left foot pain for the past 3 weeks. Further, she had developed a knot on her foot. She arrived in a wheelchair and indicated she was unable to bear weight. She reported no improvement in pain with her medications. Physical examination was mostly normal with no edema, but the [Plaintiff] opted to undergo aspiration of hematoma of the foot. Notably, she had less pain and swelling to her foot following the procedure (Exhibit 14F, p. 7). Moreover, at the hearing the [Plaintiff] did not require the use of an assistive device for ambulation. In fact, she testified to having a cane at home, which she tries not to use.

As to degenerative joint disease (DJD) of the right shoulder, on August 12, 2017, the [Plaintiff] was treated in the emergency room for complaints of right shoulder pain. She reported having pain ever since she suffered a fall in January. Physical examination was positive for pain, swelling, and decreased range of motion. An x-ray of the [Plaintiff]'s right shoulder dated August 2017 showed evidence of moderate hypertrophic degenerative change of the acromioclavicular (AC) joint.

The impression was arthritis of the shoulder (Exhibit 1F, pp. 20-29). The undersigned has accounted for the [Plaintiff]'s shoulder condition in the above RFC with a limitation to frequently reaching overhead with the dominant right upper extremity.

Regarding chronic obstructive pulmonary disease (COPD), during consultative examination in September 2018, the [Plaintiff]'s lung fields were clear and no use of accessory muscles was noted (Exhibit 3F). On May 14, 2019, the [Plaintiff] was seen in the emergency room for bronchitis and COPD exacerbation. She was noted to be in moderate distress. Respiratory examination revealed abnormal breath sounds. However, her symptoms improved with medication. She was placed on Zithromax, Prednisone, and Robitussin (Exhibit 7F, p. 48). A primary care note dated June 2019 indicated the [Plaintiff] was seen for COPD exacerbation. However, respiratory examination was normal (Exhibit 12F, p. 62). A chest x-ray dated June 2019 revealed only slight bibasilar atelectasis and mild chronic changes (Exhibit 7F, p. 37).

Pulmonary function testing in September 2019 revealed the [Plaintiff] had reduced FEV1 and FVC, no airway obstruction, and normal diffusing capacity. The impression was nonspecific pattern of pulmonary abnormality. The [Plaintiff]'s COPD supports the finding that the [Plaintiff] can tolerate occasional exposure to extreme cold and wetness and can tolerate frequent exposure to fumes, odors, dusts, gases, and poor ventilation. As to obesity, during consultative examination in September 2018, the [Plaintiff] was 5'7" tall and weighed 255 pounds with a BMI of 39.94 (Exhibit 3F).

(Tr. 23–26).

### C.    The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through December 31, 2023, and that she has not engaged in substantial gainful employment since April 21, 2018, the alleged onset date of disability.  (Tr. 17).  The ALJ also determined that Plaintiff has the following severe impairments: degenerative disc disease (DDD), degenerative joint disease (DJD) of the right shoulder, obesity, chronic obstructive pulmonary disease (COPD), and mild to moderate degenerative changes of the left ankle.  (Tr. 17–18).  In addition, the ALJ determined that Plaintiff has the following non-severe impairment(s): diabetes mellitus, hypertension, and leg edema.  The records support that these impairments have not caused more than minimal limitation in the ability

7

to perform basic work activities since the alleged onset date. (Tr. 18). Because Plaintiff's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the Plaintiff's ability to do basic work activities, they are non-severe. (Tr. 20). Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (Tr. 21).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

After careful consideration of the entire record, the undersigned finds that the [Plaintiff] has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) with occasional climbing of ramps and stairs; never climbing of ladders, ropes, or scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling. She can perform frequent reaching overhead with the dominant right upper extremity; can tolerate occasional exposure to extreme cold and wetness; and can tolerate frequent exposure to fumes, odors, dusts, gases, and poor ventilation.

(Tr. 22).

As for the allegations about the intensity, persistence, and limiting effects of Plaintiff's symptoms, the ALJ found that they are inconsistent with the record. The record does not support the alleged loss of functioning to the extent alleged. After considering the evidence of record, the assessed RFC incorporates Plaintiff's limitations that are supported by the evidence. (Tr. 23).

As to the medical source opinions of record, the ALJ found:

On September 18, 2018, Dimitri Teague, M.D., a State agency medical consultant, reviewed the claim and opined the [Plaintiff] was limited to light exertion with occasional climbing of ladders, ropes, or scaffolds; occasional crawling; and frequent climbing of ramps and stairs, stooping, kneeling, and crouching (Exhibits 2A and 4A). The undersigned finds this opinion is partially persuasive. The undersigned concurs that the record adequately supports the opinion of light exertional capacity. In addition, the record supports postural limitations, although specific restrictions in the [Plaintiff]'s above RFC are shown to be somewhat different. However, the evidence now of record supports a limitation of frequent reaching overhead with the right upper extremity and supports environmental

limitations based on the [Plaintiff]'s COPD.

On February 27, 2019, Maureen Gallagher, D.O., a State agency medical consultant, reviewed the claim and opined the [Plaintiff] was limited to light exertion with no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; and frequent overhead reaching with the right upper extremity (Exhibits 6A and 8A). The undersigned finds this opinion is somewhat persuasive. The undersigned concurs that the record adequately supports the key opinion of light exertional capacity. In addition, the postural limitations are supported by the evidence of record and consistent with the [Plaintiff]'s above RFC. However, although the consultant evaluated the [Plaintiff]'s COPD under Section 3.02, she failed to provide any environmental restrictions.

On September 13, 2018, Hitnebagilu Krupadev, M.D., a consultative examiner, opined the [Plaintiff] was limited to less than sedentary (Exhibit 3F). The undersigned finds this opinion is not persuasive, as the opinion is vague and the physician used programmatic terms about the functional exertional level instead of descriptions about the [Plaintiff]'s functional abilities and limitations.

(Tr. 26–27).

Relying on the vocational expert's testimony, the ALJ determined that Plaintiff is capable of performing her past relevant work as a shift supervisor/manager. (Tr. 27). In addition to past relevant work, the ALJ further determined that given her age, education, work experience and RFC, there are jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as a rental clerk, lay-away clerk or a clerical assistant. (Tr. 27–28). The ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since April 21, 2018. (Tr. 29).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.    DISCUSSION

Plaintiff asserts that the ALJ's RFC is not supported by the evidence of the record, because the ALJ failed to properly consider and include limitations for Plaintiff's leg edema and mental impairments in her RFC and Plaintiff does not have the ability to perform light work, on a sustained basis, as found by the ALJ. (Doc. 15). The Commissioner counters that the ALJ provided detailed discussions of Plaintiff's edema and mental health impairments at the second step of the sequential evaluation and that the ALJ's residual functional capacity determination was supported by substantial evidence. (Doc. 16).

### 1.    Edema, Depression, and Anxiety

Plaintiff argues that the ALJ erred when she found that Plaintiff's leg edema and mental health impairments were non-severe. (Doc. 15 at 7). She further argues that when crafting the RFC, the ALJ disregarded the symptoms of her edema and mental health impairments. (*Id.* at 11).

At step two, the ALJ must consider whether Plaintiff's alleged impairments constitute "medically determinable" impairments. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic

techniques[,]" and "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. Additionally, to be classified as "medically determinable" an impairment must meet the durational requirement, meaning, "it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. "If an alleged impairment is not medically determinable, an ALJ need not consider that impairment in assessing the RFC." *Jones v. Comm'r of Soc. Sec.*, No. 3:15-cv-00428, 2017 WL 540923, at *6 (S.D. Ohio Feb. 10, 2017).

The finding of at least one severe impairment at step two is merely a threshold inquiry, the satisfaction of which prompts a full investigation into the limitations and restrictions imposed by all the individual's impairments. *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007). "And when an ALJ considers all of a [plaintiff]'s impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two '[does] not constitute reversible error.'" *Id.* (quoting *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *accord Smith v. Comm'r of Soc. Sec.*, No. 2:20-cv-1511, 2021 WL 972444, at *10 (S.D. Ohio Mar. 16, 2021) (finding no error despite ALJ's failure to designate plaintiff's neuropathy as a medically determinable or severe impairment where the ALJ discussed plaintiff's neuropathy and considered its impact on plaintiff's ability to work).

In such a situation, the ultimate inquiry is whether substantial evidence supports the RFC fashioned by the ALJ. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1545(a). An RFC is an "administrative finding," and the final responsibility for determining an individual's RFC is reserved to the

Commissioner.  SSR 96-5p, 1996 WL 374183, at * 1–2 (July 2, 1996).  The Circuit has explained that "the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence."  *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).

First, the Undersigned finds Plaintiff's allegation that the ALJ erred by classifying her leg edema and mental impairments as non-severe without merit.  As to the leg edema, the ALJ found that "the record does not indicate the presence of leg edema lasting for 12 continuous months," which precludes a finding of severe impairment under 20 C.F.R. § 404.1509.  (Tr. 18).  The ALJ noted that Plaintiff was seen in the emergency room for complaints of ankle and feet swelling on June 10, 2019.  (*Id.*).  During that visit, Plaintiff denied chest pain, shortness of breath, or recent changes in medication, but reported worsening symptoms when walking for extended periods of time.  (*Id.* (citing Tr. 476)).  The EKG performed at that time was normal, and the chest x-ray showed no acute process.  (*Id.* (citing Tr. 481)).  Plaintiff was advised to elevate her legs for thirty minutes, three times daily; to take a fluid pill once daily; wear compression hose; and follow up with a primary care provider in two weeks.  (*Id.* (citing Tr. 481)).

The ALJ noted that Plaintiff's follow-up visit to a primary care physician on June 19, 2019, "indicated her bilateral edema had improved."  (*Id.* (citing Tr. 655)).  On August 15, 2019, an examination revealed "no swelling or redness of any joints."  (*Id.* (citing Tr. 563)).  On August 20, 2019, Plaintiff returned to the emergency room, where examination demonstrated "non-pitting edema of bilateral feet, ankles, and lower legs[,]" but with intact motor, sensation, and pulses, and no evidence of deep venous thrombosis.  (*Id.* (citing Tr. 510–17)).  Cardiac testing in September 2019 indicated no chest discomfort, no acute ischemia changes, and a normal ejection fraction.  (*Id.* (citing Tr. 605, 611, 614)).  Finally, in October 2019, a primary care note stated that Plaintiff

had occasional bilateral leg edema and reported no clubbing or cyanosis of her extremities.  (*Id.* (citing Tr. 679, 681).

Based upon this consideration of the record, the ALJ concluded that "the record reveals no associated cardiac diagnosis to account for her leg edema." (*Id.*).  Further, the reports of intermittent edema over several months did "not indicate the presence of leg edema lasting for 12 continuous months." (*Id.*).  In other words, the record itself did not establish that edema had lasted twelve continuous months, nor did it establish an underlying condition (like a cardiac diagnosis) which would suggest it could be expected to last for twelve continuous months.  Thus, the ALJ's finding that the edema was non-severe is supported by substantial evidence.

As to the mental health impairments, the ALJ noted that Ryan Wagner, Psy. D., performed a consultative psychological evaluation of Plaintiff on November 5, 2018, and diagnosed major depressive disorder, recurrent, moderate and generalized anxiety disorder.  (Tr. 19 (citing Tr. 397–404)).  Dr. Wagner further opined that Plaintiff's reported mental health symptoms might affect her work performance, including her ability to receive critical feedback, maintain appropriate coworker relationships, and respond to work pressures.  (*Id.*).  Yet, the ALJ did not find Dr. Wagner's opinion persuasive, as it was "based mainly on [Plaintiff's] reported symptoms during a one-time evaluation[,]" and was vague, without "specific work-related limitations." (*Id.*).

In July 2019, Plaintiff had a follow-up for her anxiety and depression with a primary care physician.  (*Id.*).  She reported improvement of her depression and anxiety symptoms on Zoloft and requested a refill of the medication.  (*Id.* (citing Tr. 660)).  The ALJ further noted that Plaintiff had been prescribed medication by her primary care physician and "has not required treatment by a mental health professional[,]" nor "emergency room treatment or hospitalization for a mental impairment." (*Id.*).  Thus, because the record demonstrated Plaintiff's mental impairments were

"generally controlled with medication[,]" the ALJ found that Plaintiff's major depressive disorder and generalized anxiety disorder, considered singly and in combination, did not cause more than minimal limitation in her ability to perform work activities and were thus non-severe. (*Id.*). The Undersigned finds this determination supported by substantial evidence. Accordingly, the Undersigned finds the ALJ did not commit error in labeling Plaintiff's leg edema and mental impairments as non-severe.

Even had the ALJ committed error in labeling these impairments, it would not be reversible. The ALJ found other impairments to be severe, proceeded through the sequential analysis, and considered all Plaintiff's impairments when crafting the RFC. (Tr. 22–23) (considering all Plaintiff's "symptoms" and "medically determinable impairments"). Yet, Plaintiff argues that the ALJ altogether disregarded her symptoms of edema, depression, and anxiety when crafting the RFC, and that additional limitations should have been imposed, "such as the ability to elevate her legs as needed, throughout the workday; limiting [Plaintiff] to simple, routine, repetitive work; additional time off task; additional break time; and additional absences per month . . . ." (Doc. 15 at 11).

At the outset, the Undersigned notes that "[t]he Sixth Circuit has made clear that an ALJ's decision must be read as a whole." *Carpenter v. Comm'r of Soc. Sec.*, No. 2:18-CV-1250, 2019 WL 3315155, at *10 (S.D. Ohio July 24, 2019), *report and recommendation adopted*, No. 2:18-CV-1250, 2019 WL 3753823 (S.D. Ohio Aug. 8, 2019) (considering the ALJ's discussion of Plaintiff's depressive disorder at step two when determining if the RFC is supported). So the ALJ's statements that she considered all symptoms and impairments when crafting the RFC (Tr. 22–23), coupled with her careful evaluation of edema, depression, and anxiety at step two (Tr. 18–

14

20), mean that Plaintiff's allegation that the ALJ disregarded these impairments when crafting the RFC is without merit.

And significantly, the ALJ assessed which work limitations might be appropriate when evaluating Plaintiff's edema and mental health impairments. Regarding edema, the ALJ noted that Plaintiff received only one initial recommendation to elevate her legs, and her impairment was non-severe. (Tr. 18). Yet, the ALJ also noted that "even if [Plaintiff] had to elevate her legs three times per day, the vocational expert testified that if she had to elevate her leg more than two times during an eight-hour workday she could still perform her past work as a shift manager/supervisor along with the other jobs identified below unless leg [elevation] was required for the entire day, which is not shown by the evidence of record." (*Id.*). In support of her proposed limitations, Plaintiff offers citation to her own hearing testimony and the medical evidence documenting her self-reported symptoms of edema, all of which the ALJ reasonably considered. (Doc. 15 at 8) (citing Tr. 35, 38, 45, 460, 476, 487, 511, 513, 653, 678, 680). The ALJ's decision to exclude limitations related to edema from the RFC is supported by substantial evidence. And because the ALJ relied on the vocational expert's testimony that Plaintiff could perform her past relevant work and other light work even if she did need to elevate her legs several times a day, any error to include those limitations in the RFC would not affect the ultimate non-disability finding.

As to the mental health impairments, the ALJ considered each of the four functional areas of limitation:

> The first functional area is understanding, remembering or applying information. In this area, the claimant has no limitation. The claimant has a high school education with no history of special education classes. She was oriented to all spheres and had no difficulty recalling aspects of her upbringing. She performed in the average range on brief abstract reasoning. Her fund of information was intact. She performed in the low average range on a brief short-term memory activity in that she recalled three of four words after a brief delay [(Tr. 397–404)].

15

The next functional area is interacting with others. In this area, the claimant has mild limitation. The claimant reported having positive relationships with some friends and family. She indicated she got along well with teachers and classmates while in school. She appeared tense and on edge during the evaluation. However, rapport was adequately established during evaluation. She did not describe any conflicts with people in multiple settings [(Tr. 397–404)].

The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. During mental status examination, she repeated five digits forward and three digits backward. She struggled with serial 7's, but was able to complete serial 3's in 16 seconds with one error. She was able to mentally calculate basic subtraction, multiplication, and division. She displayed adequate task persistence when answering questions. She did not report a history of problems with attention and concentration in school or within work environments [(Tr. 397–404)].

The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. The claimant reported being able to regularly attend to her grooming and hygiene, perform household chores, prepare meals, drive, take medication as prescribed, go to the store, pay bills, and make her own appointments. She had adequate insight into her difficulties. Further, the claimant did not endorse a history of emotional deterioration in work settings [(Tr. 397–404)].

(Tr. 19–20).  Plaintiff argues that because Dr. Wagner and state agency psychologists concluded that Plaintiff had more pronounced limitations in some of these categories, the ALJ should have adopted work-related mental health limitations into the RFC.  (Doc. 15 at 9–10).

Particularly, Plaintiff notes that the state agency psychologist opined she had moderate limitations in her ability to maintain concentration, persistence, and pace and in her ability to adapt or manage herself.  (Doc. 15 at 9) (citing Tr. 72).  Accordingly, the state agency psychologist opined that Plaintiff's "ability to carry out routine, repetitive, and 3–4 step tasks with adequate persistence and pace would not be significantly limited, but would be limited for detailed or complex/technical tasks."  (Tr. 82).  The ALJ considered the opinions of the state agency psychologists, including the recommended limitation for detailed or complex/technical tasks, but found them inconsistent with the evidence of record.  (Tr. 20) (citing Tr. 67–85, 87–105, 107–24, 126–43).  As described above, the ALJ remarked that Plaintiff had never required mental health

16

treatment, and that her "depression and anxiety appear effectively controlled with medication" prescribed by primary care physicians. (*Id.*).  The ALJ further noted medical records in which Plaintiff denied anxiety and depression.  (*Id.*) (citing Tr. 449, 554).

Plaintiff also argues that the ALJ should have adopted Dr. Wagner's opinion that she "had some difficulty maintaining attention and focus; was distracted; may have instability when presented with critical supervisory feedback; may have difficulty developing and maintaining appropriate co-worker relationships; and symptoms may compromise her ability to respond to work pressures."  (Doc. 15 at 9) (citing Tr. 402).  But, as previously described, the ALJ did not find Dr. Wagner's opinion persuasive, as it was "based mainly on [Plaintiff's] reported symptoms during a one-time evaluation[,]" and was vague, without "specific work-related limitations."  (Tr. 19).

Plaintiff says the ALJ "erroneously disregarded these medical opinions and, as a result, it can only be assumed that the ALJ used her lay opinion to draw her conclusions about [Plaintiff's] limitations."  (Doc. 15 at 9).  But an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). In other words, an ALJ is not required to recite medical opinions verbatim.  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  And certainly, where, as here, an ALJ has identified an opinion as unsupported by the evidence of record, the ALJ need not include all opined limitations in an RFC.  At base, the ALJ's determination that the opined limitations need not be included in the RFC is reasonable and supported by substantial evidence.

The Undersigned finds Plaintiff's allegation that the ALJ erred in classifying her edema and mental health impairments as non-severe—and that the ALJ disregarded symptoms of the same when crafting the RFC—without merit.

## 2. The Light Work RFC

Plaintiff next argues that the ALJ erred in designing an RFC for light work because Plaintiff is unable to stand or walk for six hours of her workday. (Doc. 15 at 11).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe*, 342 F.App'x at 155. *See also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). Substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

When determining the RFC, the ALJ is charged with evaluating several factors, including the medical evidence (not limited to medical opinion testimony) and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). The RFC assessment must be based on all the relevant evidence in her case file. 20 C.F.R. § 416.945(a)(1). Since Plaintiff filed her application after May 23, 2017, it is governed by the relatively new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017).

The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.  20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5).  Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from the claimant's medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements."  §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered.  §§ 404.1520c(b)(2); 416.920c(b)(2).  An ALJ may discuss how he or she evaluated the other factors but is not generally required to do so.  *Id*.  In addition, when a medical source provides multiple opinions, the ALJ need not articulate how he or she evaluated each medical opinion individually.  §§ 404.1520c(b)(1); 416.920c(b)(1).  Instead, the ALJ must "articulate how [he or she] considered the medical opinions . . . from that medical source together in a single analysis using the factors listed [above], as appropriate." *Id*.

As Plaintiff identifies, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251, at * 6 (Jan. 1, 1983).  She argues the ALJ erred in finding that she was capable of light work because: (1) "[t]he record consistently documents . . . chronic back pain, cervical and lumbar degenerative

disc disease, moderate stenosis, and degenerative joint disease at L3-L4, mild foraminal narrowing at C3-C4 and C5-C6 on the right and left, lumbar spinal stenosis, numbness, tingling, and pain radiating into her limbs, frequent falls, and edema in her bilateral lower extremities[;]" and (2) Dr. H.L. Krupadev, a consultative examiner opined that Plaintiff should be limited to less than sedentary work.  (Doc. 15 at 12).

The ALJ considered Plaintiff's impairments, including those cited by Plaintiff as significant here, when crafting the RFC.  (Tr. 23–27).  In assessing the records of Plaintiff's impairments, the ALJ developed several significant through lines.  First, Plaintiff's motor strength and sensation remained intact.  (Tr. 23) (citing Tr. 341) ("normal motor strength at 5/5 and intact sensation"); (*id.*) (citing Tr. 391) ("no muscle weakness or atrophy"); (Tr. 24) (citing Tr. 445) ("5/5 strength in bilateral lower extremities"); (*id.*) (citing Tr. 568) ("normal strength, intact sensation, no atrophy").  Second, diagnostic testing consistently failed to find any acute injury associated with Plaintiff's impairments, though mild to moderate conditions were sometimes observed.  (Tr. 23) (citing Tr. 337) ("X-ray findings revealed no acute traumatic pelvic or left hip pathology"); (*id.*) (citing Tr. 374) ("a computerized tomography (CT) scan revealed no fracture o[r] dislocation of the pelvis or either hip"); (*id.*) (citing Tr. 376) ("CT scan of the cervical spine revealed mild multilevel degenerative changes and no evidence of fracture or subluxation of the spine"); (*id.*) (citing Tr. 377) ("CT of the lumbar spine revealed no acute fracture or dislocation, no disc protrusion or central spinal stenosis, and mild to moderate stenosis of the left L3-4 neural foramen secondary to decreased disc height and discovertebral complex"); (Tr. 24) (citing Tr. 546) ("magnetic resource imaging (MRI) of . . . lumbar spine . . . revealed mild to moderate DDD of the lumbar spine with mild to moderate stenosis"); (*id.*) (citing Tr. 467) ("X-rays of . . . lumbar spine, cervical spine, and shoulder were negative for acute fractures or dislocation"); (Tr. 25)

(citing Tr. 698) ("X-rays revealed no evidence of a foot injury"); (*id.*) (citing Tr. 689) ("CT of the . . . ankle revealed mild to moderate degenerative changes of the ankle mortise").  Third, Plaintiff was consistently recommended conservative treatment.  (Tr. 23) (citing Tr. 415) ("condition was treated conservatively with NSAIDS and Flexeril"); (*id.*) (citing Tr. 439) ("prescribed Baclofen for back pain"); (Tr. 24) (citing Tr. 550) ("recommended treatment included trigger point injections for pain control and physical therapy"); (*id.*) (Tr. 450) ("recommended conservative treatment with epidural steroid injections").  Ultimately, the ALJ concluded:

> The above evidence reflects generally normal physical examinations with no more than mild to moderate abnormalities. The claimant's DDD, DJD of the right shoulder, mild to moderate degenerative changes of the left ankle, and obesity are supportive of restricting her to light exertion. However, the record is not supportive of a disabling level of limitations. In fact, the above records indicated the claimant's current conditions have been generally maintained effectively with conservative treatment including medication, physical therapy, and injections. While the claimant has a history of ankle surgery, she has not required any further surgical intervention for this condition since her alleged onset date. Furthermore, the record does not indicate an intensification of treatment, which one would expect given her disabling allegations.

(Tr. 26).  Based on the foregoing, the Undersigned finds the ALJ's determination that Plaintiff was capable of light work reasonable and supported by substantial evidence.

Finally, the Undersigned finds that it was reasonable for the ALJ not to incorporate Dr. Krupadev's opined limitation to less than sedentary work into the RFC.  A medical opinion should express what a plaintiff "can still do despite [her] impairment(s) . . . ." 20 C.F.R. § 404.1513(a)(2).  The ALJ found that Dr. Krupadev's opinion failed to do so, stating that "the opinion is vague and the physician used programmatic terms about the functional exertional level instead of descriptions about the claimant's functional abilities and limitations."  (Tr. 27).  Further, the opinion was not supported by the ALJ's review of the objective medical evidence.  Nor was it consistent with other medical opinions, including those of Drs. Teague and Gallagher, who opined that Plaintiff should be limited to light work.  (Tr. 26).

The Undersigned finds Plaintiff's allegation that the ALJ erred in designing an RFC for light work without merit.

## IV.    CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that judgment be entered in favor of Defendant.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date: February 17, 2022                    /s/ Kimberly A. Jolson
                                           KIMBERLY A. JOLSON
                                           UNITED STATES MAGISTRATE JUDGE